TERRAL *v.* BROOKS.

4-4696

Opinion delivered June 21, 1937.

*William J. Kirby,* for appellant.

*R. E. Wiley,* for appellees.

GRIFFIN SMITH, C. J. Appellees, W. E. Brooks and Adeline E. Brooks, filed suit against the Southwestern Bell Telephone Company on March 12, 1936, praying for a temporary restraining order to prevent defendant from erecting a telephone pole in a driveway used by appellees as a part of the facilities of their residential property identified as plot No. 52 of Prospect Terrace Addition to the city of Little Rock. The temporary order was issued, and was later made permanent.

It is alleged in the complaint that plot 52 was purchased by appellees in 1925; that appellees immediately moved into the residence on plot 52, and that they had occupied the premises since 1925, with all appurtenances, openly, notoriously, and with the claim of title in fee simple thereto, adversely to all others.

It is further alleged that before and at the time appellees moved into the residence on said property, the driveway was laid out and was in use as the sole means of ingress and egress to the garage; that Edgewood road, which was the street opened and dedicated and on which appellees' property abutted, was paved, and a curbing separated the pavement from plot 52; that there was an opening about eight feet wide in the curbing, with rounded ends, through which the driveway opened into Edgewood road; that appellees had continuously, from 1925, used said driveway daily and at all times as a service entry to their premises, without interference, and that such use was with the claim of title through the whole length and width of the driveway; that the driveway in question consists of a strip of land between plots 51 and 52.

In its answer, the telephone company denied that appellees were owners of the real property used as a driveway, and alleged that appellees' acquisition of plot 52 was subject to certain restrictions and reservations; that the grantor from whom appellees took title reserved a strip of land between plots 51 and 52 for use of utilities, such easement being more particularly described in the original bill of assurance; that such reservation or limitation was of record in deed book 168 of the records of Pulaski county, as follows:

"The grantor herein, his successors and assigns, further reserve the right to lay or cause to be laid, gas, water, and sewer pipes and mains and conduits, and the right to place poles for carrying wires or any other purpose, on, under, through and across any and all of said addition noted on said plot or map as easements, paths, walks and cross-walks, and said grantor, his successors and assigns, or any person, corporation or utility so

authorized by him or them shall have free ingress and egress in, from and over said easements, walks, cross-walks and paths for the purpose of erecting, maintaining, or repairing such gas, water and sewer pipes or mains, conduits, wires and poles.''

On May 23, 1936, after the temporary injunction had been issued by the chancellor on March 12, Tom J. Terral filed an intervention, alleging that he was the owner of plot 51 described in appellees' complaint; that the strip of land between plots 51 and 52 was ten feet wide; that the bill of assurance contained the reservations mentioned in the telephone company's answer; that the easement was formed by taking five feet from plot 52, and five feet from plot 51, and that during the latter part of 1935 agents of appellees had offered intervener $200 for his five-foot strip. He prayed that the telephone company be required to remove its poles and lines from his lands, and ''that such easement be declared to be an easement according to its purposes, as shown by the bill of assurance referred to and that appellees be enjoined from further use of said easement as a driveway.''

There was no appeal by the telephone company.

The contention of intervener, appellant herein, is that any rights appellees might acquire through adverse possession would not begin to run until some act had been committed, or some fact had arisen, the effect of which would be to put appellant on notice that a hostile claim was being interposed; also, that recognition of the owner's title by one who occupies property will disprove adverse possession, if such recognition is made before the statutory period has run.

Appellant Terral testified that he owned plots 50 and 51 of Prospect addition; that Mr. Brizzolara of the Union National Bank called him on two occasions and offered to buy his five-foot strip of land for Mr. Brooks, and was willing to pay $200 therefor. He said that Brizzolara told him the reason Brooks wanted to buy was because he (Brooks) recognized that it belonged to appellant. Mr. Brooks' son also offered to buy the land ''so his mother and father would not be troubled as to whether they

owned it." Witness said he knew he could not sell the strip except subject to the easement for utilities; that Mr. Kahn, from whom he purchased plot 51, told him that if he put anything in this strip that would block the utilities, he did so at his own risk. He said that appellees had built a sun-porch on plot 52 contiguous to the easement and this had the effect of narrowing the space so that appellees ran against his (appellant's) shrubbery in getting cars in and out of the garage; that Mr. Kahn told him, before he bought plot 51, that the easement was for use of utilities and was not intended as a driveway.

On cross-examination appellant Terral testified that the first offer of Brizzolara as agent for Brooks was made about two years ago, before any controversy over the land had arisen; that the trouble started when Mrs. Terral undertook to project a walk over the five-foot strip on plot 51, and was stopped by Mr. Brooks, who claimed it was a private driveway and directed her not to walk on that space. Witness said he first bought plot 50 some time after Brooks moved into the residence on plot 52, and about a year later witness bought plot 51. The telephone pole was on the corner before he (Terral) bought plot 51. He admitted that appellees had been using the driveway for about ten years.

W. E. Brooks testified that when he bought plot 52 the dwelling thereon had just been completed, but the garage had not been finished when appellees moved in; that in 1934 or 1935 a sunporch was added to the western end of the house; that the driveway was used in getting in and out of the garage, but was also used by the telephone company's trucks in hauling material in that vicinity. When appellees first moved in, the driveway was open from Edgewood through Sherwood to Crestwood, and was used as a passway for the public from the street car line. Gilbert Blass, who owned property a little south and west of plot 52, closed this pathway by building a wall across it at the alley back of plot 52. Witness had used the pathway as a driveway since that time, and before. The driveway as at present outlined is about eight feet wide and runs to the rear of the plot. There has never been a telephone pole in the driveway, the nearest

being about twenty feet south of Edgewood and 10 or 12 inches west of the west side of the driveway, on plot 51. No suggestion of placing a pole in the driveway had ever been made, and the only actual use by the telephone company was erection of two poles, neither of which was in the driveway. Witness said that Mr. McCall of the telephone company called and told him Mr. Terral didn't want the pole on his plot to remain there any longer, and the company intended to set it over the line on the driveway. Such action would completely deprive witness of the use of the driveway.

"Beyond question or doubt I understood we had the driveway and part of it was on plot 51 and part on plot 52, and it was already laid out and measured. We have never questioned our right to use it for a driveway as it was a part of the property which we purchased. No one has ever questioned our right to it until this question came up. We didn't ask any questions and no one raised any objections. We used it knowing that the dividing line between the two plots went right down the center of the driveway. The boundaries of the driveway were coincident with the cut in the curb running straight back between parallel lines to the rear property line, the width being about eight feet."

On cross-examination Brooks testified that at the time he bought the property he knew the utilities had the right to use this strip, but he did not know the exact dimensions of the easement until some time later, when he saw the bill of assurance. The driveway is not paved. The sunporch was built to within six or eight inches of the driveway. The plat on file in the circuit clerk's office shows a reservation of the easement, without specifications for a driveway, nor does appellees' deed call for a driveway. "I used this as a driveway supposing it was part of the property, although no one told me so." Witness also testified that he knew nothing of the purchase offer made by his son; that Brizzolara's offer was in the nature of a compromise, made after witness had used the driveway more than seven years; that appellees had never questioned Terral's right to all the ground west of the center line of the driveway, but only recognized the

title subject to use of the driveway which witness understood was for the joint use of those owning the adjacent properties. The telephone company laid a conduit under the driveway in 1930 or 1931, but did not interfere with use of the surface. Appellees made no objection to this work, as the conduit was placed west of the dividing line between the two lots.

V. P. Knott, engineer, testified that in his professional capacity he laid out the first section of Prospect Terrace which included plots 51 and 52; that he was familiar with the easement between the plots, and it was laid out for use of the utilities, and not for a driveway.

In order that adverse possession may ripen into ownership, possession for seven years must have been actual, open, notorious, continuous, hostile, exclusive, and it must be accompanied with an intent to hold against the true owner. *Watson* v. *Hardin,* 97 Ark. 33, 132 S. W. 1002. Where a landowner, through mistake, takes possession of land of an adjacent owner, intending to claim only to the true boundary, the possession is not adverse. *Murdock* v. *Stillman,* 72 Ark. 498, 82 S. W. 834; *Goodwin* v. *Garabaldi,* 83 Ark. 74, 102 S. W. 706; *Couch* v. *Adams,* 111 Ark. 604, 164 S. W. 728. But it is different if a landowner, acting under a mistake as to the true boundary, takes possession of the land of another, believing it to be his own. There the intent is to retain possession under an honest belief in ownership, and there is an adverse purpose. *Shirey* v. *Whitlow,* 80 Ark. 444, 97 S. W. 444. One entering upon the possession of land under a deed of conveyance to him is presumed to occupy and to claim only the interest named in his conveyance. *Wilson* v. *Stortz,* 117 Ark. 418, 175 S. W. 45.

In *Britt* v. *Berry,* 133 Ark. 589, 202 S. W. 830, it was held that a party claiming title after seven years of possession gained nothing, because claimant had not acted to bring to the defending party knowledge or notice of the adverse claim. It was also said that where entry upon land is permissive, the statute of limitations will not begin to run against the legal owner until an adverse holding is declared and until notice of the changed status has been brought to the owner.

In *Fulcher* v. *Dierks Lumber & Coal Co.*, 164 Ark. 261, 261 S. W. 645, this court said that the holding of land, begun by permission, would not ripen into an adverse or hostile right until notice of such adverse holding had been brought home to the owner, and occupancy had continued for the statutory period. In *DeMers* v. *Graupner*, 186 Ark. 214, 53 S. W. (2d) 8, it was said that "Evidence showing that an adjoining landowner mowed the grass on a small strip adjoining defendant's fence was not sufficient to establish adverse possession where there was nothing to bring home to defendant the knowledge that plaintiff was intending to divest defendant of title by adverse possession."

Decisions of this court are in harmony with the general rule laid down in Corpus Juris Secundum, Adverse Possession, Vol. 2, § 45, p. 559, which reads as follows: "Notorious possession contemplates possession that is so conspicuous that it is generally known and talked of by the public or the people in the neighborhood." On the question of notice, the textwriter says: "The true owner must have knowledge or notice that the possession is hostile; and this may and must consist either of actual knowledge or of constructive notice arising from the openness and notoriety of the possession. * * * Possession which is so open, visible, and notorious as to give the owner constructive notice of an adverse claim need not be manifested in any particular manner; but there must be such physical evidence thereof as reasonably to indicate to the owner, if he visits the premises and is a man of ordinary prudence, that a claim of ownership adverse to his is being asserted."

At page 627 it is said: "Admission or recognition of another's title precluding hostility of possession of claimant may be shown by claimant's offer to purchase another's interest."

At page 646 it is said: "Claim or use of an easement is consistent with, rather than hostile to, the title of another to the fee, and possession attributable to the easement will not be regarded as adverse to the fee title

of another unless and until there is notice of a hostile claim to the fee.''

And, finally, there is this rule: ''Where the original entry on another's land was amicable or permissive, possession, regardless of its duration, presumptively continues as it began, in the absence of an explicit disclaimer. The presumption is rebuttable by evidence of adverse holding with notice to the true owner.'' (p. 823)

Tested by these general rules, and by decisions of this court, we are of the opinion that the chancellor was in error when he decreed that the telephone company be forever enjoined from erecting any telephone poles on the driveway or from otherwise obstructing it, and that the intervention be dismissed for want of equity and that the intervener be forever enjoined from interfering with the continued and permanent use of the driveway by appellees.

Appellees had knowledge of reservations made with respect to the west five feet of plot 52, and they knew that certain rights were retained for utilities. They did not at the time of purchase know just what these limitations were, but W. E. Brooks testified that no one told him the driveway belonged to his property, and when he examined the bill of assurance he became acquainted with actual conditions.

Admittedly, a five-foot strip on the west end of plot 52, owned by appellees, and a five-foot strip on the east end of plot 51, owned by appellant-intervener, attached to the fees of the two plots, subject to the easement reserved for utilities. The telephone pole referred to by W. E. Brooks as being about 20 feet south of Edgewood and 10 or 12 inches west of the west side of the driveway on plot 51, might be on the five-foot strip of plot 51 reserved for utilities, or it might be on intervener's land west of that to which the easement attached, for Brooks testified that the driveway was about eight feet wide. The defined driveway did not, therefore, cover the entire width of the two reserved strips. Intervener Terral testified that he notified the telephone company to remove the pole from his property, ''as I didn't think my prop-

erty should be used by the utilities when I had already dedicated five feet from my lot for that purpose.'' It is fairly inferable that Terral intended to say that the pole was on his property west of the reserved strip.

When appellees moved into their property, the drive-way between plots 51 and 52 had been well marked and was used alike by appellees, the general public, and for utilities. Appellees, therefore, accepted the situation as they found it, and without questioning any one, or assert-ing any hostile or adverse rights, they began to make use of accommodations thus afforded. The evidence does not show when Gilbert Blass closed the passway. This may, or may not, have occurred within seven years, and there is only an inference that the obstruction was built more than seven years prior to the time the suit was filed.

There was nothing in the character of the use made of the driveway by appellees to put appellant-intervener on notice that appellees intended to appropriate the prop-erty to the exclusion of the owner of the fee, and to the exclusion of rights reserved in the bill of assurance. Res-ervations as to utilities were in the interest of the public, and no company or firm or person engaged in that class of business had any right paramount to that of any other company or firm or person similarly engaged. Acts of appellees in making use of the driveway, not being in-consistent with rights reserved for the utilities, could not have the effect of putting on notice those who might, at some future period, be called upon to supply utility ac-commodations essential to the general welfare, and as to such persons, firms, or corporations, the statute would not begin to run in favor of appellees until the service was required and there had been a refusal to permit entry.

Use of the driveway, as such, was not necessarily inconsistent with concurrent occupancy of the easement by the telephone company. Rights of the two had not been in conflict, and until 1934 or 1935 there had not been an intimation by appellees that they would object to a continuation of the kind of usage of the property which had been formerly made by the telephone company. On

the contrary, as late as 1930 or 1931 the telephone company laid its conduits under the driveway. Appellee W. E. Brooks undertook to explain this by saying that he did not object to this entry because construction was on or under the easement reserved from plot 51—the Terral property. This strip of land, however, is the sole subject of controversy, and it is the identical property appellees are now contending for, on the theory that they have held adversely for more than seven years.

The record reveals that the first hostile claim made by appellees occurred in 1934 or 1935, when the sunporch was built on land extending to within a few inches of the east side of appellees' five-foot strip. The natural effect of this construction was a declaration by appellees that in making use of the driveway they would occupy a part of intervener's easement, this being necessary to freedom of movement.

There is no proof on behalf of the telephone company that its occupancy of the land upon which the pole in question is situated has ripened into adverse possession. The telephone company's only contention is that it should not be deprived of rights granted under the bill of assurance, and to this we assent.

Reversed and remanded, with directions to enter an order denying the relief prayed for by appellees and to grant the prayer of appellant-intervener that reservations and conditions pertaining to the easement on, over, and under the five-foot strip of land on the east end of plot 51, as defined in the bill of assurance, be treated as continuing, and that appellees be enjoined from using same in any manner inconsistent with the rights of the owner of the fee under restrictions imposed by the bill of assurance.