GAMMON v. MILLS.

4-7841                                           192 S. W. 2d 554

Opinion delivered February 25, 1946.

*Botts & Botts,* for appellant.

*George E. Pike,* for appellee.

MILLWEE, J.   On January 3, 1930, Olivia L. Ticknor of Rockford, Illinois, through her representatives in this state, entered into a contract of sale with J. A. Gammon whereby she agreed to sell, and Gammon to buy, an 80 acre tract of land described as the north half of the northeast quarter of section 18, township 3 south, range 2 west, in the Southern District of Arkansas county.   J. A. Gammon agreed to pay $1,600 for the land and executed nine notes of $150 each payable January 3, 1931 to 1939 inclusive, and one note of $250 due and payable January 3, 1940, each note bearing six per cent. interest from date. Under the terms of the contract a warranty deed was executed by Olivia L. Ticknor and her husband, Frank A.

Ticknor, which was deposited in escrow in the First National Bank of DeWitt, Arkansas. The deed recites that it was executed in accordance with the contract of sale, and that it was to be delivered by the bank upon payment of the purchase price. The deed also recites: "This deed being a 'purchase money mortgage' and the rights being hereby so retained by the seller."

Frank A. Ticknor died in April, 1932, and Olivia L. Ticknor died in June, 1937, leaving appellee Ruth Ticknor Mills, a daughter, as their only heir at law. J. A. Gammon died in February, 1932, without making any of the payments under the contract.

On June 10, 1941, appellee filed this suit in chancery court against the widow and heirs of J. A. Gammon alleging execution of the contract, notes and deed, and offer of performance of the contract on the part of Olivia L. Ticknor, prior to her death, and appellee thereafter. She also alleged that she had tendered the warranty deed to the heirs at law of J. A. Gammon and had made demand for payment of the amount due under the contract which was refused. Judgment was prayed for $2,697.87, the amount of the purchase money, and interest, alleged to be due, and for foreclosure of the lien against the lands.

Appellants, Luther Gammon and Earl Gammon, are the sons of J. A. Gammon and filed their separate answer in which they denied any knowledge of the contract and notes executed by their father, and admitted they had never performed any of the terms thereof. They further alleged that they were joint owners in fee simple of the lands by adverse possession for more than seven years prior to the filing of the suit and had made valuable improvements on the property. They asked that title to the property be quieted in them. The widow of J. A. Gammon filed her separate answer in which she alleged abandonment of the contract by the parties and surrender of the possession of the lands to the Ticknors in 1930. She also disclaimed any right or interest in the lands and admitted that no part of the alleged purchase price had been paid by her husband or his heirs. Answer was

also filed by two other children and heirs of J. A. Gammon, and a tenant who had been in possession of the lands for several years immediately prior to the filing of the suit.

The trial court found the issues in favor of appellee and a decree was entered May 21, 1945, ordering the foreclosure of a lien under the contract of sale in satisfaction of the unpaid purchase money, interest, and court costs. The court also found that the rents received by appellants, Luther Gammon and Earl Gammon, were offset by improvements made by them. A commissioner was appointed to conduct a sale and the clerk was directed to issue a writ of assistance to the purchaser at such sale. Appellants have appealed from this decree.

J. A. Gammon moved on the lands in controversy in January, 1930, when the contract and notes were executed. The drouth of that year resulted in a crop failure and in November or December, 1930, he moved with his family to another farm nearby where he resided until his death in February, 1932. The two sons, Luther and Earl Gammon, were members of his household at that time and moved with the family, Luther being 19 years of age, and Earl being 21 years of age. It is uncertain from the testimony whether the lands were occupied in 1931. In January, 1932, and prior to the death of their father, the two sons moved some household goods back to the lands in controversy and Luther "batched" there for a time. Taxes which J. A. Gammon had agreed to pay under his contract with the Ticknors became delinquent. On September 28, 1933, Luther Gammon redeemed the lands from the state for taxes for the years 1930, 1931 and 1932. Apparently the only interest which permitted his redemption of the lands at that time was his status as an heir of his deceased father and as agent for his father's estate. Earl testified that they thought they were getting a tax title to the property by redemption. He has resided with his mother on other lands owned by her since the death of his father. Luther Gammon moved to Nashville, Tennessee, in 1935 where he married and resided until his induction into the army in 1943. It is undisputed,

however, that they have been in possession of the property through their tenants since 1932. They have paid the taxes and collected the rents each year and have received the landlord's share of government parity payments.

The only question before the chancellor, and which it is necessary for us to consider on this appeal, is the nature of the possession of the appellants, Luther and Earl Gammon, and whether or not their holding of the lands for more than seven years was adverse and hostile to appellee and her parents. Unless the holding of the chancellor on this issue is against the preponderance of the evidence, the decree must be affirmed.

Several witnesses who had lived near the lands testified on behalf of the appellants that the Gammon boys moved on the property in 1931 or 1932, claimed the property as their own, and that the lands were generally known in the community as the Gammon boys' place. Earl Gammon testified that he and his brother went on the place in January, 1932, and that his brother "batched" in the house on the place until it was rented to a tenant in 1933. The place was in bad repair and they rebuilt the fence in places, covered the house and dug a well. While he testified that it was their plan to live on the property and that they claimed it as their own, he gave the following testimony on cross-examination: "Q. You didn't go on this place in January, 1932, for the purpose of defeating the rights of the people who sold to your father? A. No, sir. Q. You didn't have any intention of holding the property against these people who sold the place to your father, and you and Luther went on that property in 1932 for the purpose of getting it for yourselves against local people who might move in ahead of you? A. Well, yes, it was our intention to buy it from the state. Q. But your intention wasn't to defeat the rights of these people who had sold to your father? A. Well, no, we thought it sold for taxes."

At the time appellee was threatening institution of the present suit, she received certain letters from appel-

lant, Earl Gammon, two of which were attached to the deposition of appellee. In these letters Earl Gammon was apparently seeking information as to the nature of appellee's claim, and we quote from the letter of February 3, 1941, as follows: ''I am writing you in regards to the property we are trying to get settled. We have no reason to try to take the place or cause you any extra expense. There has been three or four different parties that have tried to claim the place before now, and your lawyer hasn't furnished me enough information to convince me you are the right party. Until you do furnish me better evidence I cannot afford to sign the place over to Mr. Pike. Mrs. Mills, any information you can send me will be appreciated and it might save you extra expense.''

While the statements in these letters may not be considered for the purpose of divesting a title that had already ripened by adverse possession, they may, nevertheless, be considered to show the character of possession prior to the lapse of time necessary to give title, and bear on the question whether the possession of the Gammon boys was in fact hostile. *Russell* v. *Webb,* 96 Ark. 190, 131 S. W. 456; *Hutt* v. *Smith,* 118 Ark. 10, 175 S. W. 399; *DeWeese* v. *Logue,* 208 Ark. 79, 185 S. W. 2d 85; *Sloan* v. *Ayres, ante,* p. 119, 189 S. W. 2d 653.

Earl Gammon was living in the family household when he and his brother took possession of the place. At that time, he was over the age of 21 and his father knew of the occupation of the property by his sons. The effect of Earl's testimony is that he and his brother were not claiming an interest in the lands hostile to that of the Ticknors as late as September, 1933, when redemption of the property from delinquent taxes for 1930, 1931 and 1932 was effected. It is true, he testified that he and his brother were wholly ignorant of the contract between their father and the Ticknors, but the chancellor evidently did not consider such testimony as being undisputed in view of the interest of the witness as a party to the suit, the close family relationship, and other sur-

rounding circumstances. The letters written in July, 1940, and February, 1941, tend in some measure to corroborate his testimony to the effect that possession of the lands by the witness and his brother was permissive and not hostile to the title and interest of appellee, or her parents. There was also testimony by the widow of J. A. Gammon tending to show an abandonment or repudiation of the contract of sale by the Ticknors in consideration of the surrender of the premises by J. A. Gammon. However, the purchase money notes executed by J. A. Gammon were in Olivia Ticknor's possession at the time of her death in 1937, and have been held by appellee since. The other papers have remained with the bank at De-Witt, Arkansas, as escrow agent.

The chancellor found the evidence insufficient to show adverse possession of the lands by the sons of J. A. Gammon for the statutory period, and we are unwilling to say that his holding on this issue is contrary to a preponderance of the evidence. The decree is, therefore, affirmed.