**DIERKS LUMBER AND COAL COMPANY, a corporation, Plaintiff,**

v.

**M. H. VAUGHN and J. A. Barnett, Defendants.**

Civ. A. No. 2315.

United States District Court
E. D. Arkansas, W. D.
June 17, 1954.

Wootton, Land & Matthews, Hot Springs, Ark., for plaintiff.

Rose, Meek, House, Barron & Nash, Little Rock, Ark., for defendants.

DELEHANT, District Judge.

The plaintiff, a Delaware corporation lawfully doing business in Arkansas, instituted this action against the two designated defendants, both citizens of Arkansas. It sought to obtain a judgment or decree quieting in it and against the defendants the title to two designated parcels of Saline County, Arkansas land, the separate parts of which were allegedly claimed by the several defendants. After the institution of the suit, the defendant Vaughn and the plaintiff adjusted their differences in such fashion that he and the land which he claimed were eliminated from the controversy, which persists only between the plaintiff and the defendant Barnett.

Barnett, answering, claims the ownership by adverse possession of the southwest quarter of the southeast quarter of section thirty-five (35), township one. (1) North, range eighteen (18), West; and the west half of Lot three (3), northwest quarter of section one (1), township one (1) South, range eighteen (18) West, all in Saline County, Arkansas. The value of the described land exceeds three thousand dollars. Hence jurisdiction unquestionably exists.

Upon the opening of the trial it was made clear to the court that, although Barnett's claim extended to all of the land lately described, evidence would be advanced in support of his possession only of so much of it as lies within the alleged enclosure effected by a fence, a bluff and a river or large creek, which were the subject of considerable testimony and are discussed at length herein.

The case was fully tried on its merits and the court has considered the briefs of counsel together with the evidence. The facts, as found, are now set down.

The record title to all of the land in litigation admittedly stands in the plaintiff under conveyances of approximately thirty years standing. The evidence is silent touching the payment of taxes upon the premises.

The land in suit, although described as two parcels, lies in a single tract. Part of it, that in the southwest quar-

ter of the southeast quarter of section thirty-five (35), lies north of the base line between townships one (1) North and one (1) South, and the rest, that in Lot three (3) of the northwest quarter of section one (1), lies south of that base line. It is unimproved, except to the limited extent that fencing stands on it. The parcel north of the base line with a minor exception immediately hereinafter noted is uncultivated rough scrub timber land. That south of the base line is somewhat less rolling and less generally timbered, and upon it are two cultivated patches, one 3.11 acres and the other 1.15 acres in extent (the latter of which to a noticeable extent and the former very slightly project northerly from the base line) and two other small parcels, one .50 acre and the other .49 acre, of larger patches located mostly on land admittedly belonging to Barnett lying adjacent to and westerly from the land in suit.

The land respecting which evidence was submitted is much longer from north to south than from east to west. Its westerly boundary runs due north and south and a segment of it is the west line of the southwest quarter of the southeast quarter of section thirty-five (35). Considering now only the land allegedly enclosed, its easterly boundary is a small river or large creek with a high bluff for its east bank which first touches the land just a few feet east of its northwest corner and runs in a southeasterly direction to a point slightly south of the base line, and then bends to the southwest and crosses the projection southward of the west boundary of the land in dispute less than one hundred feet south of its southwest corner. An improved highway extends generally in a northerly and southerly direction in the neighborhood of, but not exactly on, the west boundary of the land in suit. Northerly from the base line the highway is fairly near to the boundary line, lying slightly to the west of it at the northwest corner but crossing not far south of that corner into the land in litigation and remaining in it to the base line except for two short crossings or contacts. From the base line, proceeding southerly, the highway remains about, or slightly more than, one hundred feet east of the west line of the land in controversy until it turns quite sharply southwesterly and leaves that land at its southwest corner. Two hundred thirty-five feet southwesterly from the southwest corner of the disputed premises the highway is crossed by a cattle guard. And another cattle guard crosses it about one hundred two feet northwesterly from the northwest corner of the property in controversy.

Barnett is a farmer and school teacher who was reared from boyhood in the near neighborhood of the controverted premises, and owns land lying immediately west of that part of the disputed parcel located south of the base line. His home is three-eighths of a mile southerly from the south limit of the land sued for.

One Joe Tillery owns and occupies the parcel of land which lies immediately westerly from the southwest quarter of the southeast quarter of section thirty-five (35) and immediately north of the base line and Barnett's land just referred to.

For more than fifteen years next before the trial there had been, and at the time of the trial there was, maintained a fence along a course now described. It starts on the westerly river bank at a point one hundred forty-two feet southwest of the southwest corner of the land in suit and proceeds thence westerly to the southerly end of the south highway cattle guard. Beginning again at the northerly end of the cattle guard, it runs in a direction slightly west of north to the base line, being at all points in this course upon land admittedly owned by Barnett. Thence, it proceeds east on the base line to a point nineteen feet west of the southwest corner of the southwest quarter of the southeast quarter of section thirty-five (35). From this point it runs northerly, first for about three hundred feet on Joe Tillery's land, then for some four hundred feet

on the land in suit and only slightly east of its west boundary. Returning again to the Joe Tillery land, it continues thereon until it reaches the southwesterly end of the north highway cattle guard. The fence resumes at the northeasterly end of that cattle guard and in a southeasterly curve first over land not involved in the suit crosses the north line of the southwest quarter of the southeast quarter of section thirty-five (35) and enters and is located on, the land involved. Slightly southeasterly from this location the fence reaches a high bluff constituting the east bank of the river and from that point it is no longer continuous. But the river and its high easterly bluff bank form an effective barrier to the passage of animals at all places down the course of the stream to the southwest corner of the litigated property, except at a few short intervals where ravines exist. And these are spanned by crude stakelike barriers adequate, in association with the related terrain, to restrain cattle and horses.

The fence was erected by Barnett, largely, but not entirely, in replacement of like fences maintained in approximately the same location by Barnett's father. Insofar as it rests on Tillery's land, it was installed with Tillery's knowledge and consent. Barnett now maintains, and for more than fifteen years continuously before the trial had maintained the fence.

The fence south of the base line reaches a maximum distance of about six hundred feet west from the land in suit. As it proceeds north from the base line, it is much nearer the property line, ranging from a few feet to a maximum distance of one hundred fifty nine feet near the north end of the fence where it is on Tillery's land. Along most of its course the fence can be seen from the highway; but there are segments of it which are not observable from the highway.

None of the fence is of sturdy modern design or construction. It is somewhat primitive, or perhaps more exactly ricke-

ty, yet adequate to confine domestic cattle and horses. It is made generally of barbed wire fastened to standing trees and also to posts, largely of the stake variety. Where it crosses the highway the fence is intercepted; but for those intervals the cattle guards provide fully adequate restraint against the passage of livestock.

Many years ago, and between dates not satisfactorily shown, but ending in 1934, Barnett maintained fencing along the top of the high bank running on the east side of the stream. But this segment of fence has not been kept effective for a long period of time and only traces of it appear, and these at remote and infrequent intervals.

When Barnett was a small boy his father, who was his predecessor in the ownership of the land whose legal title is now vested in Barnett, claimed ownership of the land in suit and regularly used it for the pasturing of his livestock and small parcels of it for the tillage of annual crops. When his father died Barnett succeeded as one of his heirs to the ownership of an undivided share in his father's land and bought the interests therein of the other heirs.

Throughout his ownership of his own land and for more than fifteen years next prior to the trial Barnett has continuously, regularly, and under a claim of ownership, used the land within the boundaries of the fence and the river and bluff for the pasturing of his cattle. This employment has been more general in the area south, than in that north, of the base line, but that has arisen in consequence of the greater density of timber in the northerly area. He has pastured all of it to the extent of its susceptibility to that use.

Through that interval also he has continuously used the available portions of the land for the production of crops, including from time to time both row crops and hay. These portions are almost entirely in the land south of the base line, a circumstance which is attributable to the rougher character of the area north of that line. In and

along with the southerly portion of the property Barnett has long had two fairly large fields, each of which is located principally on adjacent land owned by him but projects into the land in suit, one to the extent of .50 acre, the other to the extent of .49 acre. These approximately half-acre parcels out of the land in suit are integrated into, and form parts of, larger fields along with land in Barnett's unchallenged ownership. Two other and distinct fields, one 3.11 acres, the other 1.15 acre, in extent lie principally south of, but both cross to the north of, the base line. During parts of the time these fields or patches have been separately fenced sufficiently to exclude cattle and horses from them. But the evidence does not show how continuous that practice has been.

Upon these fields Barnett has raised various row crops, including corn and he has also harvested hay. Some years he has left one or more of the patches unplanted, and has kept the voluntary vegetation on such untilled space mowed and cut. Sometimes, too, he has leased to others portions of the patches, occasionally with the result that his lessees have neglected to produce a crop on the land. For about three years next prior to the trial no row crops had been raised on the arable patches.

During more than fifteen years Barnett has cut timber on the land in suit both for fence posts and for firewood. And through that period he has occasionally sold wood which he cut from the land and also allowed others under license from him to cut wood from the land.

About five years before the institution of this suit an agent of the plaintiff found Tillery cutting timber on a portion of the land lying north of the base line. Tillery then asserted, but not in Barnett's presence, that he claimed the land north of the base line and Barnett that south of the line, and that he, Tillery, was cutting in the timber north of the line to prevent Barnett from acquiring that land, as well as what lay south of the line. The plaintiff did not compel Tillery to surrender the logs he had cut but stopped further cutting by him.

Approximately a year later one Bates, a neighbor, either as an employe or as a licensee (the evidence is uncertain respecting the exact status) of Barnett, cut some two hundred six logs from the land south of the base line. The plaintiff discovered this action and stopped Bates and took for itself the severed logs, all without any then current contact with Barnett, who, however, later learned that Bates had been interrupted in his operations and the logs had been taken. Noted as a fact but by the court regarded as presently uninstructive is the circumstance that in its removal of the logs cut by Bates, the plaintiff, through its employees, entered the premises from the north end, that is the end more remote from Barnett's place of residence, and dealt with Bates, not Barnett.

About three years prior to the trial, Tillery removed a short segment of the fence at its extreme north end and at a point where it is on land of a stranger to this action. Within a few days after such removal, Barnett discovered it, and he immediately restored the removed segment with Tillery's knowledge. Tillery made no objection and did not again remove the fence at the point in question.

So far as the evidence discloses, the plaintiff has made no use of the land in suit during the interval since its acquisition. The premises are not such as would be fit for agricultural employment, except to the extent that Barnett has cleared and tilled the small patches already mentioned. The plaintiff has not yet exploited the timber resources on the property, whatever may be its eventual purpose in that behalf. And it has not pastured it or leased it for pasturage.

To the extent that the land in suit has been susceptible of possession and use, Barnett, continuously through more than fifteen years before the trial, possessed and used, and still possesses and uses it. He has cleared and cultivated so much

of it as might profitably have been treated in that fashion. He has pastured the entire property, using each segment of it in proportion to its adaptability to pasturage. And he has taken timber from it at such times as have pleased him. All this he has done under claim of right and ownership, succeeding in point of time but with no grant of authority, a like claim on the part of his father to whose owned land Barnett did regularly succeed.

Occasionally, but infrequently, men living in the neighborhood of the disputed land have entered the premises and started to cut wood for fence posts. Barnett usually learned of such course and, when he did, ordered its discontinuance. His orders were complied with.

█ The land being located in Arkansas, the law of that state must be applied. Title 28 U.S.C.A. § 1652; Erie Railroad Company v. Tompkins, 304 U. S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Even before the ruling last cited, the state's law would have controlled. Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, since no species of property is more surely fixed than real estate, within the thought of Swift v. Tyson, supra.

The Supreme Court of Arkansas has had frequent occasion to deal with the law under which the title to real estate within its boundaries may be acquired by adverse possession. The state has afforded an economic situation, of which this action is fairly reflective, in which cases of that nature readily arise. Some of its rulings may now be recalled as presently instructive in varying degrees of directness.

They arise against the background of Section 37–101, Arkansas Statutes 1947 which in part, provides:

"No person or persons, or their heirs shall have, sue or maintain any action or suit, either in law or equity, for any lands, tenements or hereditaments but within seven (7) years next after his, her or their rights to commence, have or maintain such suit shall have come, fallen or accrued: and all suits, either in law or equity, for the recovery of any lands, tenements or hereditaments shall be had and sued within seven (7) years next after title or cause of action accrued, and no time after said seven (7) years shall have passed."

Touching the factor of the payment of taxes, the following two sections of the statutes may be considered:

Section 37–102, Arkansas Statutes 1947:

"Uninproved (unimproved) and uninclosed land shall be deemed and held to be in possession of the person who pays the taxes thereon if he have color of title thereto, but no person shall be entitled to invoke the benefit of this act (section) unless he and those under whom he claims shall have paid such taxes for at least seven (7) years in succession, and not less than three (3) of such payments must be made subsequent to the passage of this act."

Section 37–103, Arkansas Statutes 1947:

"Payment of taxes on wild and unimproved land in this State by any person or his predecessor in title, for a period of fifteen (15) consecutive years (at least one of said payments being made after the passage of this act [section]), shall create a presumption of law that such person, or his predecessor in title, held color of title to said land prior to the first payment of taxes made as aforesaid, and that all such payments were made under color of title."

█ In order that adverse possession may ripen into ownership, possession for seven years must have been actual, open, notorious, continuous, hostile, and exclusive; and it must be accompanied with an intent to hold adversely and in derogation of, and not in conformity with, the right of the true owner. Nicklase v. Dickerson, 65 Ark. 422, 46 S.W.

945; Driver v. Martin, 68 Ark. 551, 60 S.W. 651; Earle Improvement Co. v. Chatfield, 81 Ark. 296, 99 S.W. 84; Watson v. Hardin, 97 Ark. 33, 132 S.W. 1002; Young v. Knox, 165 Ark. 129, 263 S.W. 52; Alphin v. Blackmon, 180 Ark. 260, 21 S.W.2d 426; Terral v. Brooks, 194 Ark. 311, 108 S.W.2d 489; Smart v. Murphy, 200 Ark. 406, 139 S.W.2d 33; Stricker v. Britt, 203 Ark. 197, 157 S.W.2d 18; Dials v. Bryant, 211 Ark. 212, 199 S.W.2d 753; McCulloch v. McCulloch, 213 Ark. 1004, 214 S.W.2d 209; Thomason v. Abbott, 217 Ark. 281, 229 S.W.2d 660; Montgomery v. Wallace, 216 Ark. 525, 226 S.W.2d 551; Berry v. Cato, 220 Ark. 36, 245 S.W.2d 824; Staggs v. Story, 220 Ark. 823, 250 S.W.2d 125.

■■ Continuous adverse possession for the seven-year statutory period vests title in the adverse possessor as completely as would a conveyance from the holder of a valid record title. Earle Improvement Co. v. Chatfield, supra; Doniphan Lumber Co. v. Case, 87 Ark. 168, 112 S.W. 208; Dail v. Etchison, 173 Ark. 1180, 291 S.W. 998; Smart v. Murphy, supra; Hart v. Sternberg, 205 Ark. 929, 171 S.W.2d 475; Montgomery v. Wallace, supra. And after adverse possession for the statutory period, recognition of the validity of his adversary's title by the adverse possessor does not divest the adverse possessor of title; but such admission may be considered by the court in determining the character of the possession during the statutory period. Shirey v. Whitlow, 80 Ark. 444, 97 S.W. 444; Hudson v. Stillwell, 80 Ark. 575, 98 S.W. 356; Hutt v. Smith, 118 Ark. 10, 175 S.W. 399; Blackburn v. Coffee, 142 Ark. 426, 218 S.W. 836; Hart v. Sternberg, supra; Deweese v. Logue, 208 Ark. 79, 185 S.W.2d 85; Gammon v. Mills, 209 Ark. 832, 192 S.W.2d 554; Lowe v. Cox, 210 Ark. 169, 194 S.W.2d 892; Baughman v. Foresee, 211 Ark. 149, 199 S.W.2d 596; Harp v. Christian, 215 Ark. 833, 223 S.W.2d 778; Sanders v. Baker, 217 Ark. 521, 231 S.W.2d 106; Davis v. Wright, 220 Ark. 743, 249 S.W.2d 979.

■ Adverse possession is an affirmative defense and the burden of proof rests upon one asserting his claim of adverse possession to establish its essential elements by a preponderance of the evidence. Armstrong v. Armstrong, 181 Ark. 597, 27 S.W.2d 88; Dials v. Bryant, 211 Ark. 212, 199 S.W.2d 753; Hull v. Hull, 212 Ark. 808, 205 S.W.2d 211; Batson v. Harlow, 215 Ark. 476, 221 S.W.2d 17; See also, Love v. Cowger, 130 Ark. 445, 197 S.W. 853; Alphin v. Blackmon, supra; Lollar v. Appleby, 213 Ark. 424, 210 S.W.2d 900; Thomason v. Abbott, 217 Ark. 281, 229 S.W.2d 660; Smith v. Kappler, 220 Ark. 10, 245 S.W.2d 809.

■ Adverse possession is a possession commenced in wrong and maintained in right. Smart v. Murphy, supra; Stricker v. Britt, supra.

■ Color of title is not necessary to give title by adverse possession. However, in default of color of title possession is limited to the land actually occupied, while in the case of adverse possession under color of title, the actual possession, by presumption of law, is constructively extended to the limits defined in the instrument which provides color of title. Nicklase v. Dickerson, supra; King v. Campbell, 89 Ark. 450, 116 S.W. 899; Poole v. Oliver, 89 Ark. 578, 117 S.W. 747; Bradbury v. Dumond, 80 Ark. 82, 96 S.W. 390, 11 L.R.A.,N.S., 772; Culver v. Gillian, 160 Ark. 397, 254 S.W. 681; Pitts v. Johnson, 212 Ark. 119, 205 S.W.2d 449; Lollar v. Appleby, supra; Bailey v. Martin, 218 Ark. 513, 237 S.W.2d 16; Cooper v. Cook, 220 Ark. 344, 247 S.W.2d 957.

■ Payment of taxes is not essential to establish a claim of title by adverse possession to improved and enclosed lands where the claimant and his predecessors are in actual possession. Hargis v. Lawrence, 135 Ark. 321, 204 S.W. 755; Howell v. Baskins, 213 Ark. 665, 212 S.W.2d 353.

■ Although no color of title exists, possession of claimant's predecessors may be tacked to claimant's possession.

Howell v. Baskins, supra; St. Louis Southwestern Ry. Co. v. Mulkey, 100 Ark. 71, 139 S.W. 643; Memphis & L. R. Ry. Co. v. Organ, 67 Ark. 84, 55 S.W. 952.

For the acquisition by adverse possession of the title to timber land, there must be intent to claim the land and timber as opposed to the mere fencing of the land for the purpose of pasturing stock. Kansas City Fibre Box Co. v. F. Burkart Mfg. Co., 184 Ark. 704, 44 S.W.2d 325 wherein the claimant fenced the disputed timber land for the purpose of pasturing stock but did not then claim the land and timber.

The hostile character of possession depends upon the occupant's own views and intentions, not those of his adversary. Pinkert v. Polk, 220 Ark. 232, 247 S.W.2d 19.

Possession which is so open, visible, and notorious, as to give the owner constructive notice of an adverse claim need not be manifested in any particular manner. Terral v. Brooks, supra.

One's actual possession of land is notice to the world of the title under which he claims. Hughes Bros. v. Redus, 90 Ark. 149, 118 S.W. 414; Stricker v. Britt, supra.

Whatever puts a party on inquiry amounts to notice where inquiry becomes a duty and would lead to knowledge of the requisite fact by the exercise of ordinary diligence and understanding. Waller v. Dansby, 145 Ark. 306, 224 S.W. 615; Stricker v. Britt, supra.

Notorious possession contemplates possession that is so conspicuous that it is generally known and talked of by the public or people in the neighborhood. Terral v. Brooks, supra; Berry v. Cato, 220 Ark. 36, 245 S.W.2d 824.

To constitute adverse possession by one having no color of title, there need be no fence or building, yet there must be such visible and notorious acts of ownership exercised over the premises continuously for the time limited by the statute, that the owner of the paper title would have knowledge of the fact, or that his knowledge may be presumed as a fact. McComb v. Saxe, 92 Ark. 321, 122 S.W. 987; Culver v. Gillian, supra; Stricker v. Britt, supra; Davis v. Strong, 208 Ark. 254, 186 S.W. 2d 776; Baughman v. Foresee, supra; Pitts v. Johnson, supra; Lollar v. Appleby, supra; Cooper v. Cook, supra.

If the claimant so acts as to attract notice to his claim and persists in such action for the statutory period of time, knowledge of his hostile claim of title may be inferred as a matter of fact. Dowdle v. Wheeler, 76 Ark. 529, 89 S.W. 1002; McComb v. Saxe, supra; Culver v. Gillian, supra; Stricker v. Britt, supra; Baughman v. Foresee, supra; Lollar v. Appleby, supra.

In establishing adverse possession of land, it is no objection that natural barriers are utilized, if the natural, together with the artificial, barriers are sufficient clearly to indicate dominion over the premises, and to give notoriety to the claim of possession. Dowdle v. Wheeler, supra; Doniphan Lumber Co. v. Case, 87 Ark. 168, 112 S.W. 208 (bluff); Horseman v. Hincha, 138 Ark. 415, 211 S.W. 385 (river); Goodrich v. Mitchell, 177 Ark. 842, 7 S.W.2d 979 (bluff).

To acquire title to woodland, there must be actual use of the land of such unequivocal character as reasonably to indicate to the owner visiting the premises during the statutory period, that such use and occupation indicate the manifestation of ownership in another. Earle Improvement Co. v. Chatfield, supra; Maywood v. Mayo, 153 Ark. 620, 241 S.W. 7; see also, Terral v. Brooks, supra.

No particular act or series of acts are necessary to be done on the land to make possession actual. McComb v. Saxe, supra.

The rule of actual possession is to be applied reasonably in view of the location and character of the land claim-

ed and it is ordinarily sufficient if the acts of ownership are of such a nature as a claimant would exercise over his own property and would not exercise over another's, and if the acts amount to such dominion over the land as it is reasonably adapted to. Thompson v. Morris, 218 Ark. 542, 237 S.W.2d 473, 24 A.L.R.2d 627; Cooper v. Cook, supra.

Cultivation of land may constitute adverse possession, Sims v. Petree, 206 Ark. 1023, 178 S.W.2d 1016, and failure to cultivate for a year has been held not to break the continuity of possession of persons claiming under color of title where the buildings and fences became "dilapidated" and the land was in "sorry condition". Bradbury v. Dumond, supra.

Grazing of livestock over land is to be considered with other acts of dominion to show a possession, but the mere occupancy of land by grazing livestock upon it, without substantial enclosures or other permanent improvements, is not sufficient to support a plea of limitations; and this is true where the claimant uses no means to restrain the livestock to any particular land, or where the livestock of others are not excluded from the land. Nall v. Phillips, 213 Ark. 92, 210 S.W.2d 806.

Of course, notice and actual possession, when considering what constitutes adverse possession, cannot be treated separately. Therefore, and with a view to ascertaining whether notice and actual possession are sufficient in this case to constitute adverse possession, the following factual situations which have been held sufficient to constitute adverse possession by the Supreme Court of Arkansas are referred to:

1. A claimant allowed persons to enclose wild and uncultivated land with a fence so that it could be used for grazing stock, on the condition that they would look after the land and preserve the timber. The land was enclosed with a three-strand wire fence stretched partly on trees and partly on posts set in the ground and was used for pasture. No part of the land was cleared and no building was ever erected. The claim of adverse possession was made under color of title. McComb v. Saxe, supra.

2. Land was fenced with galvanized wire on posts 16 feet apart. The land was said to have been used for "hog cutting", but "hay cutting" seems to be the correct term. The claim of title was made under a void tax deed. Carpenter v. Smith, 76 Ark. 447, 88 S.W. 976.

3. Land was enclosed by a fence and used for cultivation and pasturage. In repairing the fence where it crossed a slough, the record owner's tenant permitted the claimant to erect the fence around the slough so as to include it within the pasture. No part of the newly enclosed land was claimed. The claimant also placed the lands on the tax books. Blackburn v. Brown, 168 Ark. 743, 271 S.W. 328.

4. The disputed land was enclosed by a wire fence which also included parts of other plots. Claimant cultivated the land up to the fence. Baughman v. Foresee, supra.

5. The disputed land was enclosed by fences on three sides and by a river on the other side. The fences on the north and west side were on the boundary, and the river on the east constituted a boundary, and the fence on the north side ran on other lands of the claimant so that the tract in question was completely surrounded by three fences and a river. The land was not cultivated and claimant's possession consisted of raising stock on the lands and taking timber therefrom. The claim was made under color of title. Horseman v. Hincha, supra.

6. The land in question was enclosed with other lands owned by claimant by running fences from the main farm to a river and by fixing the low places on the bluff of the river so as to prevent the passage of stock. The claim was made under color of title. Doniphan Lumber Co. v. Case, supra.

7. The disputed land was enclosed with other land by fences on three sides and a bluff with wire fences across gulches and ravines to keep stock out. Part of the land was cultivated. Goodrich v. Mitchell, supra.

8. Holding land under fence with other pasture land and using it as a pasture, cutting timber, and exercising other acts of ownership constituted actual, open, continuous, exclusive, and adverse possession. The claim was made under color of title. Crawford v. Davis, 147 Ark. 126, 227 S.W. 5.

9. Parts of an 80-acre tract were fenced and cultivated, timber was cut, part of the tract was leased, and timber was sold therefrom by claimants who were without color of title. Claimants also lived on another part of the land. Dominion over the land was held sufficient to constitute adverse possession. Cooper v. Cook, supra.

In Dowdle v. Wheeler, supra [76 Ark. 529, 89 S.W. 1004], an accretion bounded on three sides formed a "neck" of land across which a fence was erected. The fence was not erected on land belonging to the owner of the enclosed land. The enclosed land was used as pasture for cattle. The court held that these did not constitute such notoriously hostile acts as necessarily put the owner of land upon notice. After recognizing that natural boundaries, together with artificial boundaries, if not out of proportion, may be sufficient to give notoriety to the claim of possession sufficient to put the statute of limitations in motion, the court said:

"The question, after all, in such cases is whether the inclosure, like other acts of possession and claim of ownership, is sufficient to 'fly the flag' over the land and put the true owner upon notice that his land is held under an adverse claim of ownership. We think that in this case these acts are insufficient to sustain a claim of adverse possession. They did not constitute such notoriously hostile acts as necessarily put the owner of the land upon notice. This is especially true because the fence erected by appellants from creek to river bank was not on the land of Mrs. Wheeler, and its presence there was not notice to her that her land was fenced. She was not bound to take notice of the natural objects, the creek and the river, as barriers inclosing her land. We hold that appellants pasturing cattle within such inclosure did not, under the circumstances, constitute adverse possession so as to ripen into title."

The court is fully satisfied, and finds, that, within the meaning and intent of the law of Arkansas, Barnett, for more than fifteen years before the trial, had held all land the subject of evidence, being all of the above described land lying westerly from the top of the east bank of the river in his actual, open, notorious, continuous, hostile and exclusive possession, and that such possession was accompanied by an intent on his part to hold adversely to, and in derogation of, and not in conformity with, any right of the record owner of the premises. No single fact or element has led the court to that finding. It is based upon the entire evidence accepting that which is undisputed and determining the truth in the comparatively few areas of factual disagreement.

Of Barnett's possessory actions there can be no reasonable doubt. Regard being had to the character of the land involved, they could hardly have been more decisive. Either personally or by tenant, and possession by tenant suffices, Kimble v. Willey, 8 Cir., 204 F.2d 238, he tilled and took the crops from the arable patches, of which he had himself cleared one more than fifteen years before the trial and the others had been cleared and by him had been farmed long before that. Besides the notice which such farming necessarily gave, Barnett from time to time placed fences around some of those patches to exclude livestock, especially his own then grazing near the patches, from invasion of the tilled land.

He took timber from the land as he pleased both for his own use as firewood and fencing and for sale as lumber. Among such sales were one of gum lumber in 1934 and others of pine lumber in 1938 and 1939. There was also the more recent cutting by Bates already adverted to which, though nullified by the plaintiff's taking with a strong hand of the severed logs, yet is clearly indicative of Barnett's assertion of dominion over the timber on the premises.

Much discussion has been devoted by counsel to the impact of the fencing as an enclosure of the disputed land, in association with the river and its abrupt and high easterly bank. Considered in all of its parts, and especially in relation to the Arkansas decisions, supra, the court is persuaded that the enclosure was adequate to give notice to the plaintiff of the adverse occupancy of its land. Of the right to consider a natural barrier, such as a river or a bluff, as an element in an enclosure for purposes of adverse possession, there can be no doubt. Vide supra. It is quite true that this rule is subject to a proviso that the natural barrier be not out of proportion to the erected artificial barriers. Dowdle v. Wheeler, supra. But the court considers that no such disproportion exists in this case, especially in the light of Barnett's fencing of low intervals in the bank itself.

To be considered along with the natural barriers is the fence already described. Its sufficiency as an enclosure is challenged principally upon the ground that in much its larger part it is located not on the disputed premises or their boundaries, but rather on adjacent land of other persons, and in considerable length of Barnett himself. Nakedly seen, that contention is factually true, but it may not be allowed the consequence which the plaintiff claims for it. In its extreme northerly part the fence runs for something like one hundred fifty feet on the land in controversy and the east extremity of this segment is the high east bank of the river. Then, for some four hundred feet the fence runs just a few feet east of the west line of the southwest quarter of the southeast corner of section thirty-five. Thus entering and leaving the premises, it continues in each direction near to that west boundary and on the adjacent property. And it is apparently not questioned that for a few feet near its southerly end, the fence is on land of the plaintiff not involved in this action.

This is not, therefore, a situation in which, as in Dowdle v. Wheeler, supra, the artificial barrier was entirely on land not involved in the suit. A representative of the plaintiff examining its land at any time within the period of fifteen years next prior to the trial must necessarily have come upon the two segments of fence (omitting wholly the one near the south end) which entered, and for designated intervals extended across land within the plaintiff's record ownership. He must have seen the northeast extremity of the fence tied into the river bank as if in declaration that from that point forward the bank performed the mission of the fence. Then, proceeding to the west line he must also have seen a fence running generally north and south of which four hundred feet were nearly on the west boundary but actually a few feet into the plaintiff's supposed land. An ordinarily prudent person would have examined the course of that fence; and, doing so, would have found it to have been as the court has already recited and, together with the river and its bank, to constitute a complete enclosure of the litigated land.

Nor may the court in this case dismiss the river and its bank with the ease with which the Arkansas court disregarded the natural barriers in Dowdle v. Wheeler, supra. For within the bank itself were fences, crude to be sure but adequate, whereby the possibility of the passage of livestock through ravines was intercepted. More than that, until 1934, therefore, until several years after the plaintiff's acquisition of its title, Barnett had maintained a fence, remnants of which are still observable, at the top of the east bank, relying on the bank with

occasional space fencing, only after 1934. Both of those circumstances were enough to warn an owner of the premises that the river bank was being used by someone for something more than the restraint of the stream.

The fence, thus maintained, was constantly related to other plainly visible evidences of Barnett's occupancy of the property. Among these were the stumps of several trees which gave notice to the plaintiff of an invasion by some one of the very resource for which undoubtedly it had acquired and continued to own the property. Then, there were the cultivated patches, two of them largely in the west half of lot three but partially in the southwest quarter of the southeast quarter of section one, and two more each in telltale fashion integrated into a larger field along with adjacent land (also within the fence) belonging to Barnett. Not only were these patches tilled; they were separately fenced from time to time.

The court is, therefore, convinced not only that Barnett adversely held the entire litigated tract for more than fifteen years before the trial, but that in the totality of his manifestations of possession, the plaintiff was given adequate notice of his holding.

That the holding was under claim of right and of ownership over the whole tract the court has no doubt. It is true that the plaintiff produced witnesses who sought to narrow Barnett's claim of ownership to the land south of the base line. And there may be said to be a disagreement in the evidence upon that point. To the extent that it exists the court accepts Barnett's version of it. Testimony of employees of the plaintiff aimed at this detail impressed the court as being both equivocal and not worthy of full credence. And to the extent that Tillery declared that he was cutting wood in the area north of the base line so that Barnett could not acquire it as well as that south of the base line, he revealed his own entertainment of an understanding that Barnett claimed land on both sides, and not, as Tillery testified only on the south side, of the base line.

The exclusiveness of Barnett's possession is apparent from his interception of the occasional intrusion of his neighbors for the purpose of cutting wood. Even the single foray of that sort by Tillery in the land north of the base line was challenged by Barnett as well as by the plaintiff, though, it appears, quite indecisively by either. But, by the time that incident occurred, Barnett's adverse possession had already persisted far beyond seven years, and the title thus acquired was not subject to nullification either by the Tillery incident or by the later one involving Bates.

The findings which the court has announced have been made in complete awareness that Barnett has the burden of proving by a preponderance of the evidence every essential element of his claim of title by adverse possession. To the extent that the facts upon which that claim rests are in dispute, as well as by testimony upon details not controverted, the court considers that he has sustained that burden.

It necessarily follows that Barnett is entitled to a judgment or decree quieting in him and against the plaintiff, and all persons claiming or to claim by, through, or under it the title to and possession of that portion of the southwest quarter of the southeast quarter of section thirty-five (35), township one (1) North, range eighteen (18), West; and the west half of Lot three (3), northwest quarter of section one (1), township one (1) South, range eighteen (18) West, all in Saline County, Arkansas, which lies westerly from the top of the east bank of the Middle Fort River (that appearing to be the manner of its designation). And since no evidence adverse to the plaintiff's title to so much of the described land as lies easterly from the top of the east bank of the river has been presented, the plaintiff is entitled to a judgment or decree quieting in it and against the defendant and any and all persons claiming or to claim by, through or under him,

its title to and possession of that portion of the described premises. In the circumstances, the costs should be taxed against the plaintiff. Judgment or decree will be made and given accordingly.

Let counsel for the defendant prepare and submit to opposing counsel a judgment or decree in accordance herewith, not including detailed findings of facts and conclusions of law for which this memorandum shall suffice, and upon approval of opposing counsel submit the same to the court for signature and entry; or upon objection submit the proposed judgment or decree, together with such objections, to the court for settlement and entry. And let the judgment or decree be so prepared as to speak not as of this date but as of the date of its signature.